UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
UNITED STATES OF AMERICA,

– against –  **MEMORANDUM & ORDER**
 21-CR-165 (MKB)

KEVIN EDWARDS,
    *also known as* "Cuzzo,"

                      Defendant.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

    Defendant Kevin Edwards, also known as "Cuzzo," is charged in a one-count indictment with possessing ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), 924e(1), and 3351 *et seq*. (Indictment ¶ 1, Docket Entry No. 7.) On December 20, 2021, Edwards moved to suppress out-of-court identifications of him and to dismiss the indictment, alleging that his "due process rights were violated by impermissibly suggestive identification procedures." (Def.'s Mot. to Suppress ("Def.'s Mot.") ¶ 2, Docket Entry No. 24.) On June 30, 2022, the Court held a hearing, (Min. Entry dated July 8, 2022; Tr. of Suppression Hr'g held on June 30, 2022 ("Tr.") 1), heard testimony from New York City Police Department ("NYPD") Detectives Sean Meade and Daniel Gukelberger, and viewed video footage, (Tr. 99:16–22). The parties also submitted written briefs. (Gov't Opp'n to Def.'s Mot. ("Gov't Opp'n"), Docket Entry No. 36; Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket Entry No. 38.)

    For the reasons discussed below, the Court denies Edwards' motion.

I. **Background**

   a. **February 8, 2020 incident**

On February 8, 2020, at approximately 12:19 PM, unidentified individuals called 911 to report multiple gunshots in the vicinity of 101st Street and Northern Boulevard in Queens, New York. (Compl. ¶ 1, Docket Entry No. 1.)[1] NYPD officers responded to the scene and discovered a male victim (the "Victim") who had suffered multiple gunshot wounds to the torso and legs. (*Id.*) The Victim was transported to Elmhurst General Hospital, where he was pronounced dead. (*Id.*)

NYPD officers recovered surveillance videos from the scene and six .40 caliber shell casings. (*Id.* ¶ 2.) Law enforcement also conducted a review of license plate reader records for the area surrounding the shooting. (*Id.* ¶ 5.) At approximately 12:12 PM, three minutes prior to the shooting, a NYPD patrol vehicle's reader recorded a vehicle with a New York State license plate JLR6489 in the vicinity of 34th Avenue and 102nd Street in Queens, New York, approximately one block south of the shooting.[2] (*Id.*) Law enforcement later learned that this vehicle was a black Volkswagen Atlas registered to Edwards. (*Id.*)

On or about February 13, 2020, a witness ("Witness-1") reviewed the video footage of the shooting and identified the shooter as "Kevin" and "Cuzzo." (*Id.* ¶ 6.) On or about December 3, 2020, Detective Gukelberger reviewed the video of the shooting and identified the shooter as Edwards. (*Id.* ¶ 8.)

---

[1] The Court relies on the factual allegations in the Complaint and Indictment for the sole purpose of providing context.

[2] The Complaint does not state whether the entirety of the license plate was captured at that time, or whether it was only partially captured.

2

### b. Indictment

On March 26, 2011, a federal grand jury indicted Edwards on one count of possessing ammunition as a convicted felon. (Indictment ¶ 1.) Edwards was arraigned on May 21, 2021 and pleaded not guilty. (Min. Entry dated May 21, 2021.)

### c. Motion to suppress

Edwards moved to suppress out-of-court identifications and dismiss the indictment, claiming that his "due process rights were violated by impermissibly suggestive identification procedures." (Def.'s Mot. ¶ 2.) Edwards contends that on February 8, 2020, he was not in the vicinity of 101st Street and Northern Boulevard in Queens and did not possess ammunition. (*Id.* ¶¶ 3–4.) In addition, Edwards claims that he reviewed still photographs of the NYPD surveillance footage and that "the photographs are of such suboptimal quality that absent impermissible police suggestiveness," the "reliable identification of anyone purported to be depicted in the video footage" by Witness-1 or Detective Gukelberger "is highly implausible."[3] (*Id.* ¶¶ 5–6.) Edwards argues that the "identifications are highly questionable in light of the *Brady* material," which includes a wanted poster with a photograph of an individual who is not him, a witness who failed to identify him from a photographic array, and a lack of forensic evidence. (*Id.* ¶ 8.)

### d. Suppression hearing

On June 30, 2022, the Court held a suppression hearing and heard testimony from Detectives Meade and Gukelberger and arguments from both parties.

---

[3] Edwards also notes that Special Agent Tim Stevens states in his affidavit supporting the arrest warrant that "his entire identification was based on the same still photographs of suboptimal quality." (Def.'s Mot. ¶ 7.)

### i. Detective Meade's testimony

Detective Meade, a member of the NYPD 115th Precinct's Detectives Squad, which covers Jackson Heights, East Elmhurst, and Corona, Queens, (Tr. 21:22–25, 22:9–11), testified that on February 8, 2020, he responded to a 911 call about a male who was shot at the corner of 101st Street and Northern Boulevard at approximately 12:15 PM. (*Id.* at 22:16–23:6.) He recovered video surveillance of the shooting and reviewed it in a digital video recorder ("DVR") system. (*Id.* at 23:13–23.) Detective Meade described the video as "good" quality. (*Id.* at 51:2–7.) He explained that the video admitted at the hearing was a shortened version of the full-length video that he had recovered.[4] (*Id.* at 25:13–16.) In reviewing the video, Detective Meade identified the Victim as wearing a gray hoodie, blue jean jacket, and white sneakers and testified that three other individuals accompanied the Victim. (*Id.* at 25:21–26:5.) The perpetrator sat inside of a "black Volkswagen SUV" vehicle. (*Id.* at 26:9–10.) Detective Meade then narrated the events seen on the video as the driver of the vehicle exited the vehicle, walked towards the group of four other males, greeted three of the four males, removed a firearm from his sweatshirt, and fired numerous shots at the Victim, the fourth male. (*Id.* at 26:12–28:7.) The shooter returned to the car and the other males left the location on foot. (*Id.* at 28:16–18.) Detective Meade described the shooter as "shorter in stature than the other males that [were] present," "wearing a black cap, black sweater, black pants, [and] black sneakers." (*Id.* at 27:22–24.) He noted that the shooter was "darker-skinned, male, black, with a larger nose, . . . big lips, big white teeth, and ears that were tight to the person's head." (*Id.* at 61:17–19.) He did not observe any tattoos on the shooter. (*Id.* at 61:20–21.)

---

[4] Detective Meade noted that the NYPD's Technical Assistance Response Unit had edited the video. (Tr. 25:16–20.) A detective from this unit also assisted in zooming in during certain parts of the video. (*Id.* at 27:14–18.)

4

To identify the shooter's vehicle, Detective Meade reviewed video surveillance of the shooting and was able to identify the first three letters of the license plate as "JLR." (*Id.* at 29:1–3.) He placed those letters into the NYPD's "domain awareness system," which stores records and is connected to the New York State Department of Motor Vehicles, (*id.* at 29:6–13), and received a result from a license plate reader from an NYPD vehicle of a "black Volkswagen . . . with that license plate." (*Id.* at 29:16–17.) The vehicle was registered to Edwards. (*Id.* at 33:13–15.)

On February 15, 2020, at the 115th Precinct Detective Squad Office, Detective Meade showed the video footage to Witness-1. (*Id.* at 33:18–34:17.) Prior to the identification, he told Witness-1 that the Victim had died. (*Id.* at 33:25–34:2.) He did not tell Witness-1 that he had a suspect in the case or that he was close to finding a suspect, comment on the status of the investigation, tell Witness-1 that he believed Kevin Edwards was the suspect, or say the name "Kevin Edwards" prior to identification. (*Id.* at 35:7–21.) He did not mention any names in "order to obtain an impartial identification, if one was provided." (*Id.* at 36:4–6.) Detective Meade asked Witness-1 to let him know if the witness "recognize[d] any of the parties." (*Id.* at 34:18–22.) Witness-1 identified the Victim; the shooter, a "male by the name of Cuzzo a/k/a Kevin;" and another male by the name of "Black." (*Id.* at 35:1–2.) After Witness-1 identified the shooter, Detective Meade did not confirm the identification as being correct. (*Id.* at 36:7–11.) Detective Meade did not suggest the identities of any individuals in the video. (*Id.* at 39:6–8.)

Detective Meade then asked Witness-1 if the witness would be willing to memorialize the identification in any way. (*Id.* at 36:12–14.) On a still image obtained from the video footage, Witness-1 made a circle in the center of the document and wrote "Kevin," and then "Cuzzo."

5

(*Id.* at 36:22–37:18.) The photograph did not show any facial tattoos or neck tattoos on the shooter. (*Id.* at 56:18–23.) Witness-1 identified the Victim by circling the individual on the far left. (*Id.* at 37:24–38:2.) On another still image, Witness-1 circled one of the three males who accompanied the Victim and identified this individual as "Black." (*Id.* at 38:16–22.) Witness-1 signed the still images and Detectives Meade and Carmine Caruso from the Queens Homicide Squad also signed the identifications. (*Id.* at 38:3–39:5.)

### ii. Detective Gukelberger's testimony

Detective Gukelberger works for the Criminal Intelligence Section of the NYPD. (*Id.* at 69:1–4.) He never met Edwards formally but first became familiar with Edwards in 2011, because Edwards "was part of a narcotics set" within the 103rd Precinct. (*Id.* at 70:14–20.) He has conducted surveillance of Edwards from cars, cameras, and other vantage points; the closest that he has ever gotten to him is about ten feet away. (*Id.* at 77:16–77:22.) The last time he saw Edwards prior to the suppression hearing was approximately April of 2019, when Edwards was seated in the driver's seat of a teal blue BMW. (*Id.* at 71:6–10.) He has seen Edwards between fifteen and twenty times and is familiar with his appearance, which Detective Gukelberger describes as being on the "[s]horter side," with a "[s]tocky build, fairly muscular, thicker neck . . . a diamond-shaped jaw . . . [with] a heavy lower lip that is lighter in color" and with a hairstyle worn close-cut or shaved. (*Id.* at 71:13–22.)

Detective Gukelberger saw Edwards' facial tattoo after the identification, at "some point . . . in 2021," when Edwards was arrested for possession of a firearm, and did not see a tattoo on his neck. (*Id.* at 79:16–23, 82:3–7.) On that occasion, he was less than five feet away from Edwards. (*Id.* at 80:12–14.) Prior to seeing him in the stationhouse in person, Detective Gukelberger had not observed tattoos on Edwards' face or neck. (*Id.* at 81:5–14.)

6

On an unspecified date, Detective Gukelberger learned about the investigation involving the February 8, 2020 shooting from Detective Caruso, who called and asked him to review video footage to see if he could recognize any of the individuals depicted in the video. (*Id.* at 71:23–72:12.) With the assistance of one of the detectives of the 103rd Precinct, Detective Gukelberger reviewed the video of the incident at the 103rd Precinct. (*Id.* at 72:14–15.) Detective Gukelberger did not have access to the case files for the investigation prior to reviewing the video, and none of the other detectives indicated who was on the video. (*Id.* at 72:19–73:6.) Detective Gukelberger viewed a short clip of the surveillance video and was able to identify Edwards based on "[m]any of his distinguishable characteristics that [he] was able to make out." (*Id.* at 73:17–74:19.) He did not see a tattoo on the shooter's face or neck. (*Id.* at 82:13–17.) He notified Detective Caruso of his identification. (*Id.* at 74:20–24.)

### iii. Edwards' tattoos

Following testimony from Detectives Meade and Gukelberger, defense counsel asked the Court to permit Edwards to approach the bench so that the Court could "observe a tattoo on his face and a tattoo on his neck." (*Id.* at 86:25–87:3.) The Court asked Edwards to point to his facial tattoo, which was identified by defense counsel as "a tear drop." (*Id.* at 87:15–20.) Edwards showed the Court his tattoos. (*Id.* at 87:13–25.) The Court noted that Edwards' tattoos were not particularly distinguishable; until Edwards specifically pointed to the small tear drop tattoo on his face, the Court did not observe the facial tattoo. (*Id.* at 91:18–23.)

## II. Discussion

### a. Standard of review

A pretrial identification will only be suppressed if it is found to be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Nolan*, 956 F.3d 71, 79–80 (2d Cir. 2020) (quoting *Simmons v. United States*,

390 U.S. 377, 384 (1968)). However, the essential element that the court must determine is the reliability of the identification evidence. *See United States v. Hemmings*, 482 F. App'x 640, 646 (2d Cir. 2012) (holding that "[r]eliability is the linchpin in determining the admissibility of identification testimony" (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977))). The Court must "exclude a pre-trial identification only if it was *both* produced through an unnecessarily suggestive procedure *and* unreliable." *United States v. Gershman*, 31 F.4th 80, 92 (2d Cir. 2022) (quoting *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994)). The Court must first determine whether the "pretrial identification procedures were unduly suggestive of the suspect's guilt," *Gershman*, 31 F.4th at 92 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990)), and if the procedures were unduly suggestive, then the court should consider whether any "in-court identification is independently reliable," *id.* "[I]dentification procedures are unduly suggestive when they involve coercive elements employed to elicit a specific identification." *United States v. Muhanad Mahmoud Al-Farekh*, 956 F.3d 99, 111 (2d Cir. 2020).

Even if an identification procedure is found to be unduly suggestive, a pretrial identification may nevertheless be admitted so long as other factors indicate the identification's reliability. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972) (establishing a "totality of the circumstances" test for the admissibility of reliable identification evidence "even though the confrontation procedure was suggestive"); *United States v. Diaz*, 986 F.3d 202, 207 (2d Cir. 2021) ("The five factors set out in [*Neil*] guide [the reliability] analysis: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime

8

and the confrontation." (quoting *Neil*, 409 U.S. at 199–200)).

### b. The pretrial identification procedures were not suggestive

Edwards argues that he has reviewed still photographs taken from video surveillance footage and the photographs are of "such suboptimal quality that absent police suggestiveness[, . . .] identification of anyone purported to be depicted in the video footage is highly implausible." (Def.'s Mot. ¶¶ 5–6.)

The Government contends that the identification procedures showed that Witness-1 and Detective Gukelberger made their identifications without "any prompting or receipt of information from the investigation." (Gov't Opp'n 7.)

"[I]dentification procedures are unduly suggestive when they involve coercive elements employed to elicit a specific identification." *Al-Farekh*, 956 F.3d at 111. For example, the practice of showing a witness a single photograph is unduly suggestive, and an array is also unduly suggestive if the defendant "meets the description of the perpetrator previously given by the witness and the other [array] participants obviously do not." *Diaz*, 986 F.3d at 207 (quoting *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001)). "When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the 'principal question' in determining suggestiveness is whether the appearance 'of the accused, *matching descriptions given by the witness*, so stood out from all of the other[s] . . . as to "suggest to an identifying witness that [that person] was more likely to be the culprit."'" *United States v. Wong*, 40 F.3d 1347, 1359–60 (2d Cir. 1994) (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)).

There are no facts in the record, only Edwards' conclusory allegations and speculation, that the pretrial identifications made by Witness-1 and Detective Gukelberger were suggestive. Detective Meade did not tell Witness-1 that he had a suspect in the case or that he was close to finding a suspect, comment on the status of the investigation, tell Witness-1 that he believed

9

Edwards was the suspect, or say the name "Kevin Edwards" prior to identification. (Tr. 35:7–21.) He did not mention any names to Witness-1. (*Id.* at 36:4–6.) After reviewing the video footage, Witness-1 identified the shooter as "Kevin" and "Cuzzo," referring to Edwards' nickname. (*Id.* at 48:11–14.) Detective Meade did not suggest the identities of any of the individuals in the video, (*id.* at 39:6–8), and after Witness-1 identified the shooter, Detective Meade did not tell Witness-1 that the identification was correct. (*Id.* at 36:7–11.) There is no evidence in the record that demonstrates any suggestiveness as to Witness-1's identification of Edwards.

Similarly, Detective Gukelberger's testimony does not offer any indicia of suggestive identification. He did not have access to the case files prior to identifying Edwards and none of the other detectives in the squad mentioned anything about Edwards or in any way suggested who was on the video prior to or during his review of the video. (*Id.* at 72:19–73:6.) Based on prior surveillance work, Detective Gukelberger had seen Edwards from several angles and distances between fifteen and twenty times over a number of years and was able to identify Edwards in the video footage based on "[m]any of his distinguishable characteristics that [he] was able to make out." (*Id.* at 73:17–74:19.) There is no evidence of suggestiveness as to Detective Gukelberger's identification of Edwards.[5]

---

[5] Edwards also argues that the video quality was insufficiently clear to support the two identifications. (Def.'s Reply 8.) This argument fails for several reasons. First, Detective Meade referred to the video as being "good" quality. (Tr. 51:2–7.) In addition, the Court observed that the video "was [] very good" quality and identified some distinguishing features of some of the individuals in the video. (*Id.* at 93:14–18.) Second, the identifications are supported by other evidence in the record. Detective Gukelberger was familiar with Edwards from having seen him between fifteen and twenty times over many years and from several vantage points during neighborhood surveillance, (*id.* at 77:16–77:22), and was familiar with Edwards' appearance, which Detective Gukelberger described as being on the "[s]horter side," with a "[s]tocky build, fairly muscular, thicker neck . . . a diamond-shaped jaw . . . [with] a heavy lower

10

Accordingly, the pretrial identification procedures were not suggestive and the Court denies Edwards' motion to suppress.

### III. Conclusion

For the foregoing reasons, the Court denies Edwards' motion to suppress.

Dated: September 15, 2022
Brooklyn, New York

                                    SO ORDERED:

                                    _____s/ MKB_____
                                    MARGO K. BRODIE
                                    United States District Judge

---

lip that is lighter in color" and with a hairstyle worn close-cut or shaved, (*id.* at 71:13–22). In addition, Witness-1 demonstrated familiarity with the Victim and another one of the males in the video, named "Black." (*Id.* at 35:1–2.) Further, NYPD cameras captured an image of a partial license plate three minutes prior to the shooting in the vicinity of the shooting, (*id.* at 29:9–10, 29:16–17, 33:13–15), and the perpetrator's car is visible in the video footage. Detective Meade placed the visible license plate letters into the NYPD's "domain awareness system," which returned results for a "black Volkswagen with that license plate," (*id.* at 29:16–17), and state motor vehicle records indicate that the car is registered to Edwards, (*id.* at 33:13–15).

11